423 P.2d 1004

STATE of Idaho, Plaintiff-Respondent,
v.
Philip E. KOHO, Defendant-Appellant.
No. 9750.

Supreme Court of Idaho.

Feb. 21, 1967.

Dunlap, Rettig & Rosenberry, Caldwell, for appellant.

Allan G. Shepard, Atty. Gen., and M. Allyn Dingel, Jr., Deputy Atty. Gen., Boise, C. Robert Yost, Pros. Atty., Caldwell, for respondent.

TAYLOR, Chief Justice.

July 16, 1965, defendant (appellant) was found guilty of murder of the first degree by verdict of the jury which fixed his punishment at life imprisonment. Judgment of conviction and imprisonment for life was entered upon the verdict. Defendant prosecutes this appeal from the judgment.

The deceased, victim of the homicide, and defendant were wife and husband; they were married in New York in 1949; two sons were born of the marriage, 14 and six years of age at the time of the homicide; the family moved to Nampa, Idaho, in August, 1963; defendant and his wife were having marital difficulties in 1964; the priest with whom both consulted suggested that defendant go away for a time; in August 1964, defendant went to Estacada, Oregon, where an uncle lived, and obtained employment; the wife obtained a decree of divorce in October, 1964, in which the custody of the two children was awarded to her; defendant visited with his family at Nampa at Christmas time in 1964, at which

time he testified a reconciliation was agreed upon, to be effected after the children were out of school in the spring. Defendant came back to Idaho to visit his family in March, 1965, at which time he testified his wife told him she had changed her mind about a reconciliation. Defendant then obtained employment in Nampa, to be near his family. According to defendant's testimony he took the two boys out to the Owyhee mountains hunting on Saturday and Sunday, the 13th and 14th of March; about noon on March 17, 1965, defendant went to the home of Mrs. Ivacek, who was baby-sitter for the younger son (Mrs. Koho being at her place of employment), and asked permission to take the boy; the baby-sitter refused to allow him to take the child and defendant then went to his mother's house, where he had been staying, called the deceased at her place of employment and asked permission to take the younger boy; the request was denied, and Mrs. Koho advised defendant she was going to see her lawyer and have it fixed so that defendant could not see the children at any time.

"Q As a result of this telephone conversation, what did you do then, Mr. Koho?

"A I slammed down the phone, and I walked around for awhile, and then I went in the bedroom and I got the shotgun and I don't know, I said something. I don't remember what it was, but I said something and I walked out the door. I wanted to get out someplace to cool off or think about it. And I was thinking about going out to the Owyhee Mountains where the kids were at, where I could be alone, and I went out to the car with the shotgun."

Defendant then drove to the intersection of Dewey Avenue and Twelfth Avenue South in Nampa, where he saw Mrs. Koho in her car on her way from her place of employment on Twelfth Avenue South, to her home for lunch. Her regular lunch hour was 12:30 to 1:30 p. m.; but on this day she left for her lunch at 12:25. Defendant followed deceased to her home

where she went into an alleyway and parked her car back of the house; defendant parked his car back of deceased's car after turning at an angle to the right. Deceased alighted from her car and came back to the rear of it, where she stood talking to defendant, who remained in his car. An argument ensued.

"Q   And then what happened, Mr. Koho?

"A   I don't really remember, but I reached into the back of the car, and I got —in the back seat of the car and I grabbed the shotgun and pointed it out the window, and she was facing me, and I shot her."

Defendant also testified he knew the gun was loaded when he took it from the bedroom and placed it in his car, and that he knew it was loaded when he pointed it at the deceased and pulled the trigger. Defendant's brother, who was in the mother's home at the time, testified:

"Well, he came out of the bedroom with the shotgun in his hand and went out the door and as he did, he says, 'I will show her who is boss,' and slammed the door behind him as he went."

Defendant, on cross-examination, confirmed his brother's testimony.

■   Defendant questions the sufficiency of the evidence to show the killing was accompanied with premeditation and deliberation. His testimony that he put his gun in his car intending to go hunting, was not binding on the jury. The evidence would support a finding that he took the loaded gun with him for the deliberate and premeditated purpose of doing just what he did. The issue was settled by the jury's verdict.

Defendant assigns as error the giving of instructions 9, 13, 15, 16 and 17, and the refusal to give his requested instructions 10, 11, 12, 13, 14, 21 and 22.

■   Instruction 9 gave the jury the following definitions, which defendant contends were erroneous:

" 'Deliberately' means done in a cool state of the blood, not in sudden passion engendered by lawful or some just cause or provocation;

" 'Premeditation' means thought of beforehand for any length of time however short;"

Instruction 13 was as follows:

"You are instructed that murder which is perpetrated by any kind of wilful, deliberate and premeditated killing is murder of the first degree.

"To constitute this kind and degree of murder, the unlawful killing must be accompanied with a deliberate and clear intent to take life, in order to constitute murder of the first degree. The intent to kill must be the result of deliberate premeditation. It must be formed upon the preexisting reflection and not upon a sudden heat of passion sufficient to preclude the idea of deliberation.

"The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test it not the duration of time, but rather the extent of the reflection. *There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as successive thoughts of the mind. It is only necessary that the act of killing be preceded by a concurrence of will, deliberation and premeditation on the part of the slayer; and if such is the case the killing is murder of the first degree, no matter how rapidly they may be followed by the act of killing.*

"A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful kill-

ing as murder of the first degree." (Emphasis added).

Defendant's requested instruction 21 was practically the same as the court's 13, except that the portions of 13 which we have italicized were omitted from requested 21, and the following part of requested 21 was not included in instruction 13:

"To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decide to and commit the unlawful act causing death."

The definitions of deliberation and premeditation are not incorrect as far as they go. "Sudden passion" and "heat of blood" were defined in instruction 16, as was "reasonable provocation." These definitions were necessary to distinguish murder from manslaughter. Lawful cause or sufficient provocation were properly excluded by the definition of "deliberately" in order to eliminate excusable homicide; I.C. § 18–4012. The terms deliberation and premeditation were also further defined in instruction 13, supra. Defendant contends instructions 9 and 13 so defined the terms that the homicide was either voluntary manslaughter or murder of the first degree, to the exclusion of murder of the second degree, citing People v. Bender, 27 Cal.2d 164, 163 P.2d 8 (1945), and People v. Heslen, 27 Cal.2d 520, 163 P.2d 21 (1945). In each case the jury was instructed in language substantially the same as that we have italicized in instruction 13 as given in this case. The California court criticised such language as allowing no time for deliberation or premeditation. However, in those cases the trial court also gave other instructions which tended to infer or imply that the execution of a specific intent to kill would constitute murder of the first degree. That language was quoted in the Heslen case as follows:

"'A man may do a thing wilfully, deliberately and intentionally from a *moment's reflection* as well as after pon-

dering over the subject for a month or year. *He can premeditate, that is, think before doing the act, the moment he conceives the purpose as well as if the act were the result of long preconcert or preparation. * * ***

"'* * * this is murder of the second degree, *unless the evidence proves the existence in the mind of the slayer of the preconceived deliberate specific intent to take life at the time of the killing. If such specific intent exists at the time of such unlawful killing, the offense committed would of course be murder of the first degree.'"* 163 P.2d 29, 30.

Here the jury was not given such additional objectionable instruction. On the contrary the last paragraph of instruction 13, supra, specifically informed the jury that intent to kill is not enough to make the killing murder of the first degree. We note that the first sentence of the underlined portion of instruction 13, supra, deals only with the intention to kill and the "act of killing" and the requisite "deliberation and premeditation" is dealt with in the next sentence. The first sentence is unnecessary and the instruction would be improved by its elimination. However, we do not think the jury could have been misled in view of the further instruction given. The language in instruction 13 objected to by defendant was approved in State v. Shuff, 9 Idaho 115, 72 P. 664 (1903), and similar language was approved in State v. Snowden, 79 Idaho 266, 313 P.2d 706 (1957).

■ The court did not err in refusing to give the portion of defendant's requested instruction 21, above quoted. The jury could find the killing was deliberate and premeditated without finding that the defendant had considered the consequences of his act.

■ In its instruction 15 the court defined manslaughter in the language of the statute, I.C. § 18–4006 (prior to the 1965 amendment) except the first sentence which, in the instruction, was as follows: "Manslaughter is the unlawful killing of a human being, without deliberation, pre-

meditation, or malice." Defendant objects to the inclusion of the words "deliberation" and "premeditation." His contention is that the words have no place in the definition of manslaughter and that the word deliberation as used by the court might also eliminate an intentional killing which may be present in a case of voluntary manslaughter. While the language of the statute would have been sufficient, we do not think the instruction as given was erroneous or misleading in view of the given definitions of deliberation and premeditation. Defendant's requested instruction 10 followed the language of the statute in this regard.

■ By instruction 16 the jury was advised as to what facts or circumstances would reduce the homicide from murder to manslaughter. As regards the contention that the instruction does not expressly advise the jury that a homicide may be only voluntary manslaughter though intentional, we think that fact is implicit in the definition of voluntary manslaughter as given. Defendant complains of the sentence contained in instruction 16 as follows:

"The provocation must be of such character and so close upon the act of killing that for the moment the slayer could be considered as not master of his own understanding."

He regards the sentence as imposing upon him some kind of test of temporary insanity. The use of the word "understanding" was an unfortunate choice, but would not be understood by the jury as requiring a want of mental capacity.

■ Defendant's requested instructions 10 and 11 were taken from California Jury Instructions, Criminal numbers 308A and 310. They were correct statements of the law; but, as above indicated, were sufficiently covered by instructions given. Defendant's requested instruction 12 was taken from California instruction 311, but contained only a portion of 311. When 311 is given it should be given in its entirety. This request also was covered by instructions given.

■ Defendant's requested 13 was taken from California form 311B. This was a correct statement of applicable law, to the effect that if the jury finds the killing was murder, they may consider any evidence of provocation for such bearing as it may have on the question whether the murder was of the first or second degree. However, the definitions given of murder of the first and second degree, of the distinction between the two degrees, of malice, of provocation, of heat of passion, and the effect of a reasonable doubt as to the degree of the crime committed, were sufficient to apprise the jury that evidence of provocation was to be considered in determining the degree of murder.

■ Defendant's requested instruction 14 was as follows:

"You are instructed that when a killing is proved to have been committed by the defendant, and nothing further is shown, the law presumes the homicide was committed with malice and felonious intent, and consequently, the killing constitutes murder of the second degree, and that such presumption excludes murder of the first degree, and in such case the verdict should be for murder of the second degree."

The request was not applicable in this case. Here, not only the killing by defendant was shown; the circumstances surrounding the killing were also shown. The evidence was not only sufficient to warrant a finding of malice, but also that the killing was deliberate and premeditated. Hence, the presumption that the killing was murder of the second degree was not applicable. The jury was required to find the degree of the murder from the evidence, not on the basis of a presumption.

■ The court's instruction 17 was as follows:

"You are instructed that by the averments of this information the defendant is charged with the crime of murder, which includes not only murder of the

first degree but also murder of the second degree and manslaughter, both voluntary and involuntary.

"When a crime is by statute differentiated into degrees, it is the duty of the jury to determine by their verdict what degree thereof, if any, has been committed.

"Should the jury find from the evidence that the defendant has committed a public offense charged in the information but entertain a reasonable doubt as to which of the several degrees he is guilty, then he can be convicted only of the highest degree as to his guilt of which you have, from the evidence, no reasonable doubt."

Defendant contends that the last paragraph of the instruction was erroneous in that it did not follow the language of the statute, I.C. § 19–2105. The defendant's requested instruction 22 followed the language of the statute. The instruction as given was technically correct. It was a correct statement of the intent of the statute as applied to a case involving more than two degrees of crime, such as this where murder of the first and second degrees and voluntary manslaughter were involved. However, even in such a case the language of the statute would have been sufficient.

Judgment affirmed.

SMITH, McQUADE, McFADDEN and SPEAR, JJ., concur.